**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

UNITED STATES BANKRUPTCY COURT DISTRICT OF VERMONT
Filed & Entered
On Docket
June 3, 2011

In re:
**LiLo Properties, LLC,**
**Debtor-in-Possession.**

**Chapter 11 Case**
**# 10-11303**

# ORDER

## GRANTING INTERIM FEE APPLICATION OF KENLAN, SCHWIEBERT, FACEY & GOSS, P.C. AND OVERRULING, IN PART, FANNIE MAE OBJECTION

On March 31, 2011, counsel for the Debtor-in-Possession, Kenlan, Schwiebert, Facey & Goss, P.C. (the "Applicant") filed an interim application for legal fees and expenses (doc. ## 71, 72). In its application, the Applicant sought approval of $14,594.50 in legal fees and $1,120.02 in expenses, for a total of $15,714.52, and authorization to draw this sum from the $35,000.00 retainer it held (doc. # 71, p. 10).[1] On April 19, 2011, Fannie Mae filed a limited objection to the interim fee application to the extent that the application sought payment of fees from Fannie Mae's cash collateral that the Debtor-in-Possession (the "DIP") had transferred to the Applicant as a portion of its retainer (doc. # 82). On April 22, 2011, the DIP filed a reply to Fannie Mae's limited objection (doc. # 83), and the Office of the United States Trustee filed its consent to the interim fee application.

The Court held a hearing on the matter on April 26, 2011, at which Heather Z. Cooper, Esq., appeared on behalf of the DIP, and John J. Kennelly, Esq., appeared on behalf of Fannie Mae. The Court directed that the parties file supplemental briefs on the issue raised in Fannie Mae's objection, after which time it would take the matter under advisement. Fannie Mae filed a supplemental memorandum of law on May 3, 2011 (doc. # 85), and the DIP filed a reply memorandum on May 9, 2011 (doc. # 87). The matter is now fully submitted.

The DIP filed a voluntary chapter 11 petition on October 8, 2010 (doc. # 1). On Schedule A, the DIP listed as assets real property located at "157 State Street and 19 Loomis Street Montpelier, VT 05602" (doc. # 1, p. 9). On Schedule D, the DIP listed Fannie Mae as a creditor with a secured claim in the amount of $1,014,338.00, and indicated that its claim was secured by the State Street and Loomis Street properties (doc. # 1, p. 13). The properties are encumbered by a first mortgage held by Fannie Mae, which is governed by the terms of a multi-family mortgage, assignment of rents and security agreement

[1] In Exhibit C to its application, the Applicant indicated the current retainer balance was $34,988.00 (doc. # 71-3, p. 3).

(doc. # 10, p. 2, ¶ 4; doc. # 82, p. 2, ¶ 3; doc. # 83, p. 2, ¶ 4). The DIP filed an operating report for the month ending on October 31, 2010, indicating that it paid $10,000.00 to the Applicant from the Loomis Street operating account during October 2010 as an extraordinary expenditure (doc. # 26, p. 2).[2] On December 8, 2010, the Court entered an interim order granting Fannie Mae's motion for adequate protection and conditionally granting the DIP limited use of cash collateral (doc. # 25). On March 2, 2011, the Court entered a final order granting the DIP use of cash collateral and granting Fannie Mae adequate protection (doc. # 64).

In its papers, Fannie Mae points out that Mr. Falker paid $10,000.00 to the Applicant out of the Loomis Street account on or about October 4, 2010, four days before the petition date, and attaches a copy of check no. 1806 from Lilo Properties, LLC, to Robert Falker in the amount of $10,000.00, dated October 4, 2010, with a memo that states, "Wire Transfer to Kenlan" (doc. # 82, p. 2, ¶ 5; doc. # 82-2, p. 40). It argues that the DIP's use of Fannie Mae's cash collateral to pay a retainer violated the terms of the note and mortgage, which includes an absolute assignment of rents and a limited license for the DIP's use of rents (doc. # 82, p. 2, ¶ 5). The mortgage provides, in relevant part, that:

> 3. ASSIGNMENT OF RENTS . . ..
>
> (a) As part of the consideration for the Indebtedness, Borrower absolutely and unconditionally assigns and transfers to Lender all Rents. It is the intention of Borrower to establish a present, absolute and irrevocable transfer and assignment to Lender of all Rents and to authorize and empower Lender to collect and receive all Rents without the necessity of further action on the part of Borrower . . .. Borrower and Lender intend this assignment of Rents to be immediately effective and to constitute an absolute present assignment and not an assignment for additional security only. For purposes of giving effect to this absolute assignment of Rents . . ..
>
> (b) . . . until the occurrence of an Event of Default, Lender hereby grants to Borrower a revocable license to collect and receive all Rents, to hold all Rents in trust for the benefit of Lender and to apply all Rents to pay the installments of interest and principal then due and payable under the Note and the other amounts then due and payable under the other Loan Documents, including the Imposition Deposits, and to pay the current costs and expenses of managing, operating and maintaining the Mortgaged Property, including utilities, Taxes and insurance premiums (to the extent not included in Imposition Deposits), tenant improvements and other capital expenditures. So long as no Event of Default has occurred and is continuing, the Rents remaining after application pursuant to the preceding sentence may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument. From and after the occurrence of an Event of Default, and without the necessity of lender entering

[2] The October 2010 operating report also states that Robert Falker, the principal of the DIP, paid the Applicant $25,000.00 from his individual funds (doc. # 26, p. 2).

upon and taking and maintaining control of the Mortgaged Property directly, or by a receiver, Borrower's license to collect rents shall automatically terminate and Lender shall without notice be entitled to all Rents as they become due and payable, including Rents then due and unpaid.

. . .

22. EVENTS OF DEFAULT.

(a) any failure by Borrower to pay or deposit when due any amount required by the Note, this Instrument or any other Loan document;

. . ..

(doc. # 83-1).

Fannie Mae asserts that the DIP gave Fannie Mae a mortgage to secure repayment of the obligations it owes to Fannie Mae under a note with a balance due in excess of $1 million (doc. # 82, p. 2, ¶ 2), under the terms of the note, the DIP is required to make monthly payments on the first day of each month in the amount of $6,307.39 plus escrows for taxes and insurance, and the DIP failed to make the payment due on the note on or about October 1, 2010 (doc. # 85, p. 1). Fannie Mae argues that the $10,000.00 transfer from the Loomis Street operating account to the Applicant occurred pre-petition and after the DIP's failure to pay the October 1, 2010 payment on the note triggered an Event of Default under paragraph 22(a) of the mortgage, thereby automatically revoking the license to use rents under paragraph 3 of the mortgage, and that this transfer of funds was, in any event, beyond the scope of the limited license the DIP had to use the rents (doc. # 85, p. 3). Fannie Mae further argues that the $10,000.00 constitutes pre-petition cash collateral in which it is entitled to adequate protection (doc. # 85, p. 3), and requests that the interim fee application be granted only on the condition that the allowed fees not be paid out of the $10,000.00 of Fannie Mae's cash collateral (doc. # 82, p. 7, ¶ 7), and that the $10,000.00 cash collateral in the Applicant's possession be returned to Fannie Mae (doc. # 85, pp. 5–6).

The DIP argues that the $10,000.00 retainer was paid prior to any Event of Default (doc. # 83, p. 1), pointing out that although the note provides that monthly payments are due on the first day of each month, the note also includes a ten-day grace period (doc. # 83, p. 3, n. 2), and thus the DIP's license to use rents had not been revoked as of the date of the payment (doc. # 83, p. 3, ¶ 5). The DIP further argues that the $10,000.00 retainer was disclosed to Fannie Mae and the Court prior to the previous hearings on adequate protection, and the Court's previous orders authorizing the use of Fannie Mae's cash collateral in exchange for monthly adequate protection payments should be interpreted to include the $10,000.00 retainer (doc. # 83, p. 5, ¶ 9). In the alternative, the DIP argues that Fannie Mae's $10,000.00 collateral may be charged for administrative expenses, including attorney's fees, to the extent the expenses directly benefit Fannie Mae, and that Fannie Mae will benefit as it stands to receive approximately $400,000.00 as

a credit against the DIP obligation to Fannie Mae as a direct result of the DIP's efforts to reorganize and restructure its debts (doc. # 87, pp. 5–6, ¶ 12). The DIP requests that the Court allow the Applicant's interim fee application in its entirety and overrule all aspects of Fannie Mae's limited objection (doc. # 87, p. 6).

Fannie Mae's argument that the DIP's failure to pay the October 1, 2010 payment on the note triggered an Event of Default is without merit. The DIP's position that there was not yet a default because the note included a ten-day grace period is correct. Taking into account the ten-day grace period, the Event of Default would not have been triggered until October 11, 2010, and the DIP paid the $10,000.00 retainer to the Applicant prior to that date, on October 4, 2010. Therefore, that aspect of Fannie Mae's objection is overruled.

By contrast, Fannie Mae's argument that the DIP's use of rental income to fund a retainer exceeded the DIP's license for use of rents is sound. Paragraph 3(b) of the mortgage requires the DIP to "apply all Rents to pay the installments of interest and principal then due and payable under the Note . . .. ***Rents remaining after application pursuant to the preceding sentence*** may be retained by Borrower free and clear of, and released from, Lender's rights with respect to Rents under this Instrument" (emphasis added). By paying the $10,000.00 retainer on October 4, 2010, prior to paying the sums due to Fannie Mae on October 1, 2010, the DIP violated the terms of the ¶ 3(b) of the mortgage. Thus, those rents the DIP held the first week of October were not free and clear of, or released from, Fannie Mae's rights. The DIP's payment of the $10,000.00 to the Applicant exceeded the bounds of its license to use the rents as set forth in ¶ 3(b) of the mortgage.

However, that is not the end of the analysis. Notwithstanding the breach of the license, the DIP may be able to use Fannie Mae's cash collateral for its attorney's fees if the DIP shows that the fees sought are for services that benefitted Fannie Mae. See 11 U.S.C. § 506(c) ("[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim"); see also In re Flagstaff Foodservice Corp., 739 F.2d 73, 75–76 (2d Cir. 1984) ("if expenses for the preservation or disposition of property are incurred primarily for the benefit of a creditor holding a security interest in the property, such expenses, properly identified, may be charged against the secured creditor"); In re Trim-X, Inc., 695 F.2d 296, 301 (7th Cir. 1983). There are insufficient facts at present to make a determination as to whether the services the Applicant provided primarily benefitted Fannie Mae. Thus, the Court will defer decision until such time as the Applicant files a fee application that would draw from the $10,000.00 the DIP paid to the Applicant from Fannie Mae's cash collateral. The Court will also

defer decision on whether Fannie Mae is entitled to separate adequate protection of this $10,000.00 of cash collateral and whether the DIP must disgorge that fund to Fannie Mae, until that time. See R&G Properties, Inc., # 08-10876 (Bankr. D. Vt. July 6, 2009), In re Fay Assocs. Ltd. Pshp., 225 B.R. 1 (Bankr. D.C. 1998), In re River Oaks Ltd. Pshp., 166 B.R. 94 (E.D. Mich. 1994).

Turning to the merits of the Applicant's interim fee application, and after considering the application in light of the standards articulated in In re Fibermark, Inc., 349 B.R. 385 (Bankr. D. Vt. 2006), the Court grants the full amount of fees and expenses the Applicant seeks. As this Court previously observed:

> There is an inherent public interest that must be considered in awarding fees in a bankruptcy case. Senate Report No. 95-989, 95th Congress, 2d Session 40 (1978). U.S. Code Cong. & Admin. News 1978, p.5787. Accordingly, the Code imposes upon this Court a supervisory obligation not only to approve the employment of professionals, but also to ensure that the fees sought by those professionals in a bankruptcy case are reasonable, and that the services and expenses were actually and necessarily incurred. §§ 327–330. Notwithstanding the absence, or the compromise, of any objection to a pending fee application – or the affirmative consent of the United States Trustee – this Court has an independent judicial responsibility to evaluate the appropriateness of the fees and expenses requested. § 330(a)(3) and FED. R. BANKR. P. 2016 and 2017; S.T.N., 70 B.R. at 831; In re ACT Mfg., Inc., 281 B.R. 468, 474 (Bankr. D. Mass. 2002). This responsibility is especially acute since the professionals seek compensation out of a bankruptcy estate. S.T.N., 70 B.R. at 832. The rationale for the bankruptcy court's independent duty to review fee applications has been described as "a duty to . . . protect the estate 'lest overreaching . . . professionals drain it of wealth which by right should inure to the benefit of unsecured creditors.'" In re Keene Corp., 205 B.R. 690, 695 (Bankr. S.D. N.Y. 1997).

Fibermark, 349 B.R. at 393–94. The burden is on the Applicant to specifically describe each service rendered to establish that the time spent was actual, necessary, and justified. See Fibermark, 394 B.R. at 395. The Court finds the services the Applicant has fully set forth the nature of the services rendered and time spent on such services, and the services rendered during the application period were reasonable, necessary, and of benefit to the estate, and hence compensable. See 11 U.S.C. § 330(a); Fibermark, 394 B.R. at 394–95. The Court likewise finds that the expenses Applicant seeks to have reimbursed are eligible for reimbursement as they were actually incurred, necessary and reasonable.

Accordingly, IT IS HEREBY ORDERED that the Applicant's interim fee application for approval of $14,594.50 in legal fees and $1,120.02 in expenses, for a total of $15,714.52, is GRANTED, and shall be paid down from the funds advanced by Mr. Falker.

IT IS FURTHER ORDERED that Fannie Mae's objection is overruled to the extent it seeks disgorgement of the $10,000.00 at issue, or a denial of the fee application based upon the existence of a default on the date the DIP transferred $10,000.00 to its attorney, and the Applicant is directed to hold

said $10,000.00 in funds in trust, and not use them for any purpose or return them to the DIP, until further order of this Court.

The Court defers decision on that portion of Fannie Mae's objection and the DIP's reply that call into question whether the services the Applicant provided sufficiently and directly benefitted Fannie Mae to authorize the Applicant to apply this $10,000.00 toward payment for legal services the Applicant rendered in the chapter 11 case, whether Fannie Mae is entitled to separate adequate protection of this $10,000.00 of cash collateral, and whether the DIP must disgorge that fund to Fannie Mae, until such time as the Applicant seeks payment from that fund and the parties supplement the record on these points.

SO ORDERED.

June 3, 2011
Burlington, Vermont

Colleen A. Brown
United States Bankruptcy Judge