*Formatted for Electronic Distribution*                                                    *Not for Publication*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

Filed & Entered
On Docket
November 4, 2011

_____

In re:

    **Lilo Properties, LLC,**                                  **Chapter 11 Case**
           **Debtor-in-Possession.**                          **# 10-11303**

_____

**ORDER**
**RULING ON**
**DEBTOR'S MOTION TO DETERMINE VALUE OF FANNIE MAE'S COLLATERAL AND SET INTEREST RATE,**
**DEBTOR'S OBJECTION TO FANNIE MAE'S CLAIM,**
**FANNIE MAE'S MOTION TO SUPPLEMENT THE RECORD,**
**FANNIE MAE'S OBJECTION TO THE DEBTOR'S AMENDED SCHEDULE F, AND**
**FANNIE MAE'S MOTION TO STRIKE DEBTOR'S SUR-REPLY**

Pursuant to the Order entered on September 26, 2011 (doc. # 155), the Debtor and Fannie Mae have filed post-hearing memoranda of law, proposed findings of fact, and responses thereto. The Debtor and Fannie Mae have also filed additional procedural motions. The hearing on the Debtor's amended disclosure statement has been postponed until November 29, 2011, so that the parties will have an opportunity to consider the Court's ruling on the outstanding motions, and, in the event Fannie Mae's pending motion for either relief from stay or dismissal is denied, for the Debtor to draft and file an amended disclosure statement to the extent that is necessary prior to that hearing. This Order is entered to address all open motions except Fannie Mae's motion for relief from stay or dismissal.

THE DEBTOR'S MOTION TO ESTABLISH AN INTEREST RATE OF 5.0% ON FANNIE MAE'S CLAIM IS DENIED

The Debtor's motion to determine value (doc. # 75) seeks an order declaring the value of Fannie Mae's State Street real property collateral to be $530,000, and the proper interest rate for the Debtor to pay on this debt to be 5%. Subsequent to the Debtor filing this motion and Fannie Mae filing its opposition, the parties reached a stipulation (doc. # 147) valuing the State Street real estate at $575,000. Thus, the only open issue in this motion is the proper interest rate.

The Bankruptcy Code does not articulate the rate of interest to which secured creditors are entitled. The Supreme Court addressed this question in Till v. SCS Credit Corp., 541 U.S. 465 (2004), and in that decision considered four alternative approaches to setting the proper interest rate: the formula rate, the coerced loan rate, the presumptive contract rate, and the cost of funds rate. In Till, the Supreme Court

1

described the challenge of setting an interest rate on secured claims in a manner that ensures the creditor receives at least the value of its claim:

> A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment schemes, therefore, is to choose an interest rate sufficient to compensate the creditor for these concerns.

Id. at 474. Although Till involved a chapter 13 debtor, the Supreme Court made reference to the analogous issue in chapter 11, citing §§ 1129(a)(7), §1129(a)(7)(B), and 1129(b). Id. at 474, n.10. Ultimately, the Supreme Court found significant defects in approaches based upon the coerced loan rate, the presumptive contract rate, and the cost of funds rate; it determined that the approach that most effectively satisfied the mandates and goals of the Bankruptcy Code was the so-called formula approach. Id. at 479–80. It described the mechanics of this approach as follows:

> The formula approach has none of these defects. Taking its cue from ordinary lending practices, the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default.[18] Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment. Some of this evidence will be included in the debtor's bankruptcy filings, however, so the debtor and creditors may not incur significant additional expense. Moreover, starting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing (such as evidence about the 'liquidity of the collateral market,' *post* . . .. (Scalia, J., dissenting)). Finally, many of the factors relevant to the adjustment fall squarely within the bankruptcy court's area of expertise.
>
> [18] We note that, if the court could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cramdown loans.
>
> Thus, unlike the coerced loan, presumptive contract rate, and cost of funds approaches, the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings. Moreover, the resulting 'prime-plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor. For these reasons, the prime-plus or formula rate best comports with the purposes of the Bankruptcy Code.

2

Id. at 478–80 (internal citations and footnote omitted) (emphasis in original). The Supreme Court went on to decline to set a particular risk factor to add to the prime rate, as that issue was not before it, but the Supreme Court did observe that other courts have adopted a 1–3% range, citing In re Valenti, 105 F.3d 55 (2d Cir 1997). Id. at 480.

Based upon the record before it, this Court finds no basis for determining that either 5.0% or 5.86% is the proper interest rate. The circumstances the Court takes into account in determining the proper interest rate in this case include: the Debtor's projected income and expenses show a very tight budget, the Debtor's income is solely from the operation of rental property, the Debtor's operations are entirely dependent upon a single individual who is the sole member of the limited liability company, the Debtor proposes to refinance the subject property with 100% financing, and the Debtor's pre-petition payment history. Choosing a risk factor that ranges from 1 to 3% requires the Court to project into the future based on current and past performance, and to speculate as to future performance of the Debtor and the market; it is not an exact science. The Court starts with the premise that the lowest-risk debtors would pay prime plus 1% and the highest-risk debtors would pay prime plus 3%. Here, the Debtor advocates a risk factor of 1.75%, just under the midpoint of the range, whereas Fannie Mae argues for a risk factor of 2.61%, near the highest end of the range. Both parties focus their arguments on the interest rate they seek, rather than on the computation of the risk factor as required by Till. Taking into account the circumstances described above, the Court finds this Debtor is at neither extreme of the range, but presents more risk than the midway point. Since Fannie Mae presented no evidence to specifically support the 2.61% risk factor, the Court applies its own judgment and deems it appropriate to set the risk factor at 2.5%.

There is no dispute in the record that the applicable starting point in this computation is a prime rate of 3.25%. Therefore, the relief the Debtor seeks in its motion as to interest rate is denied; the Debtor must pay Fannie Mae interest at the annual rate of 5.75%, to the extent Fannie Mae is entitled to interest on its claim through the plan.

### FANNIE MAE'S MOTION TO SUPPLEMENT THE RECORD IS GRANTED

On October 7, 2011, Fannie Mae filed a motion to supplement the record (doc. # 170) to include a true and complete copy of trial exhibit 44, and in particular to include (i) all 35 pages of the facsimile transmission from the Debtor's principal to Arbor Mortgage (servicer for this Fannie Mae loan), and (ii) the legend on the pages showing the date and time of transmission. Since the date and time of transmission was a disputed fact at the evidentiary hearing, this supplement is pertinent. On October 14, 2011, the Debtor filed an objection (doc. # 175) to Fannie Mae's motion to supplement the record. The

Debtor is the party who sought to admit the original trial exhibit 44, and cannot now raise an objection as to foundation when a more complete copy of the document is introduced. To the extent the Debtor raises foundation issues regarding the supporting affidavit of Paul Taylor, a representative of Arbor Mortgage who also testified at the September 15th trial, the Court overruled those objections at the evidentiary hearing and they are likewise unavailing at this time. The affidavit filed with the complete and recently filed exhibit 44 establishes the authenticity and foundation necessary to admit the new exhibit. Therefore, the Court overrules the Debtor's objection and grants Fannie Mae's motion to supplement the record with this document.

FANNIE MAE'S MOTION TO STRIKE THE DEBTOR'S SUR-REPLY IS DENIED<br>EXCEPT WITH RESPECT TO PORTIONS OF SUR-REPLY RECOUNTING SETTLEMENT DISCUSSIONS

On October 18, 2011, the Debtor filed a sur-reply to Fannie Mae's proposed findings of fact and memorandum of law (doc. # 181, hereafter the "Sur-reply"). In this pleading, the Debtor addresses the following issues: whether an effective reorganization is in prospect, whether the amended plan is feasible, whether any subsequent filing regarding the claim of Scheer & Rubinstein would be out of time, the new value exception to the absolute priority rule, and the proper interest rate for Fannie Mae's debt. On October 19, 2011, Fannie Mae filed a motion to strike the Sur-reply (doc. # 182), on the grounds that the September 26th Order set October 14, 2011 as the deadline for the Debtor to file a response to Fannie Mae's proposed findings of fact and memorandum of law, the Debtor improperly disclosed the content of settlement discussions in the Sur-reply, and the Sur-reply includes an affidavit of Robert Falker that is inadmissible. On October 20, 2011, the Debtor filed an objection to Fannie Mae's motion to strike the Sur-reply (doc. # 183), requesting either denial of the motion to strike or the granting of an opportunity to supplement the record to address feasibility and the issue raised by the Debtor's recent amendment of its schedules. Lastly, on October 21, 2011, Fannie Mae filed a reply to the Debtor's objection to the motion to strike (doc. # 184), in which it declares that it would have no objection to the Debtor responding to the proposed findings of fact relating to the schedules and alleged unsecured claim of Topper, Scheer & Rubenstein *if* the Debtor concedes that the proposed findings constitute a motion to strike the amendment to Schedule F.

The Court finds Fannie Mae's inclusion in its reply proposed findings of fact and memorandum of law (doc # 174) of allegations about the propriety of filing an amended Schedule F to include Scheer & Rubinstein to be sufficient to constitute a challenge to the Debtor's amended Schedule F. Therefore, the Court will entertain the Debtor's Sur-reply on this issue. However, the Court strikes from the Sur-reply, and will not consider, the allegations therein with respect to the content of settlement discussions.

4

The Court therefore denies generally Fannie Mae's motion to strike the Sur-reply, and grants it only with regard to the portion of the Sur-reply that refers to and discloses the content of the parties' settlement discussions. The Court denies Fannie Mae's request to strike the affidavit of Robert Falker. However, as Fannie Mae points out, portions of the affidavit are inadmissible hearsay and other allegations are highly speculative; the Court will give the affidavit only such weight as is warranted under these circumstances.

<u>FANNIE MAE'S OBJECTION TO THE DEBTOR'S AMENDED SCHEDULE F IS SUSTAINED</u>

The Court found above that Fannie Mae's inclusion in its reply proposed findings of fact and memorandum of law (doc. # 174) of allegations about the propriety of filing an amended Schedule F to include Scheer & Rubinstein were sufficient to constitute an objection to the Debtor's amended Schedule F. On August 24, 2011, the Debtor filed an amended Schedule F to add "Topper Scheer & Rubinstein" as a creditor holding a general unsecured claim in the amount of $3,580.00 for 2008 and 2009 accounting services, with a mailing address of 55 Northern Blvd, Suite 410, Great Neck, NY 11021 (doc. # 144). The Debtor listed "Scheer & Rubenstein" in Schedule G of its original petition filed on October 8, 2010, for "[p]reparation of Debtor's 2009 Tax Return; due 10/15," with the same mailing address as "Topper Scheer & Rubinstein" (doc. # 1, p. 18). The Debtor also listed "Topper Sheer & Rubenstein" in its statement of financial affairs for services rendered for tax preparation from 1997 forward, with the same mailing address as above (doc. # 1, p. 27).

The Debtor argues in its Sur-Reply that "Topper, Sheer & Rubinstein" has undergone a name change with the retirement of Mr. Topper, has relocated its office since the petition date, and kept records under the name of the Debtor's principal rather than that of the Debtor (doc. # 181). The Debtor filed its chapter 11 petition on October 8, 2010 (doc. # 1). On October 14, 2010, the Bankruptcy Noticing Center served upon "Scheer & Rubenstein" by first class mail at the above address notice of the Debtor's bankruptcy case, the meeting of creditors, and the February 14, 2011 deadline to file a proof of claim (doc. # 7). "Proper mailing creates a presumption of receipt." <u>Rendina v. Northrop</u>, 399 B.R. 376, 380 (D. Vt. 2008) (citing <u>Hagner v. United States</u>, 285 U.S. 427, 430 (1932); Fed. R. Bankr. P. 9006(e) (service of notice by mail is complete on mailing)). Scheer & Rubinstein did not file a proof of claim by the February 14, 2011 deadline. Nothing in the records supports the need to add a creditor who previously received notice of the bankruptcy case; the burden was on the creditor to read the notice. The fact that the creditor recently moved and may have kept records under the Debtor's principal's name rather than under the Debtor's name is insufficient to warrant giving the creditor a second bite at the apple.

For these reasons, the Court sustains Fannie Mae's objection to the Debtor's amended Schedule F.

5

### THE DEBTOR'S REMAINING OBJECTIONS TO FANNIE MAE'S CLAIM ARE OVERRULED

As indicated in the September 26th Order, the open issue with respect to the allowance of Fannie Mae's claim, and the Debtor's objection to that claim, is the value of Fannie Mae's collateral, and in particular, whether Fannie Mae's collateral includes the net adequate protection payments and the funds in the replacement reserve account.

The parties stipulate that the real property collateral securing the Fannie Mae debt is $575,000. Fannie Mae acknowledges that its debt exceeds the value of this piece of collateral. However, Fannie Mae asserts there is other collateral securing its debt and its secured claim is not limited to $575,000 (the value of the State Street property). Fannie Mae claims it has collateral for the subject debt in the form of three other assets: (1) the net rental income / adequate protection payments it holds in the amount of $41,680.84; (2) cash collateral being held by the Debtor's counsel, as part of its retainer, in the amount of $10,000; and (3) the replacement reserve account Fannie Mae holds in connection with the subject loan, with a current balance of $8,269.62.[1] The Debtor's position with respect to Fannie Mae's claim to these three assets is that: (a) the net rental income / adequate protection payments should be a setoff – rather than an addition – to Fannie Mae's collateral; (b) the Debtor's payment of $10,000 from its rental income to its counsel was in the best interest of the estate, ultimately benefits Fannie Mae, and thus is no longer Fannie Mae's cash collateral; and (c) the loan documents require Fannie Mae to release all funds in the replacement reserve account to the Debtor in response to the Debtor's proper, pre-petition request for reimbursement of capital expenditures in excess of that amount (see Trial Ex. 44). The Court has considered the memoranda filed by the parties and will determine the value of Fannie Mae's collateral, for purposes of confirmation and the pending motion for relief from stay or dismissal, at this time.

There is a split in the case law with respect to whether adequate protection payments being held by a secured creditor should be considered an addition to the creditor's collateral or subtracted from the collateral. See Sally S. Neely et al., Postpetition Rents and the Claims of Undersecured Creditors with Assignment of Rents in Chapter 11 Cases, SD24 ALI-ABA 363 (July 23, 1998); see also In re Union Meeting Partners, 178 B.R. 664, 674–75 (Bankr. E.D. Pa. 1995) (comparing conflicting cases). The United States District Court for the District of Massachusetts has described the split as follows:

> The 'subtraction' cases hold that post-petition rent payments to the undersecured creditor should be subtracted from the secured portion of the creditor's claim as measured by the value of the real estate. See, e.g., Confederation Life Ins. Co. v. Beau Rivage Ltd., 126 B.R. 632, 640 (N.D. Ga. 1991); In re Mullen, 172 B.R. 473, 478-79 (Bankr. D. Mass.

---

[1] Fannie Mae consistently referred to these three items both prior to and at the hearing; the Court derives the amounts set forth herein from Fannie Mae's supplement to its amended proof of claim (doc. # 154), filed on September 21, 2011, pursuant to Court order, after the hearing.

1994); In re Kalian, 169 B.R. 503, 505 (Bankr. D.R.I. 1994); In re Reddington/Sunarrow Ltd. Partnership, 119 B.R. 809, 813 (Bankr. D.N.M. 1990). Conversely, the 'addition' cases hold that the amount of post-petition rents not reinvested into real estate should be added to the size of the creditor's secured claim, and that payment of those rents decreases the total amount of the creditor's claim but not the secured portion of its claim as measured by the value of its real estate. See, e.g., In re Union Meeting Partners, 178 B.R. at 675–77; In re Columbia Office Assocs., Ltd., 175 B.R. 199, 202–03 (Bankr. D. Md. 1994); In re Bloomingdale Partners, 160 B.R. 93, 99 (Bankr. N.D. Ill. 1993); In re Flagler-At-First-Assocs., Ltd., 114 B.R. 297, 301 (Bankr. S.D. Fla. 1990).

Beal Bank, S.S.B. v. Waters Edge Ltd. Pshp., 248 B.R. 668, 685–86 (D. Mass. 2000).

      This Court finds that the better reasoned cases are those that find the net adequate protection payments are an addition to the collateral; they comport more closely with the language and intent of the Bankruptcy Code. See Beal Bank, S.S.B., 248 B.R. at 686 (agreeing with "addition" approach based upon plain language of § 552(b)(2)). The Court adopts the reasoning of the Beal Bank decision, and finds that Fannie Mae's interest in the net rental income / adequate protection payments are to be added to the value of its collateral.

      With respect to the $10,000 being held by the Debtor's counsel, the Court has already ruled that the Debtor's use of rental income to fund the Debtor's legal fees exceeded the Debtor's license for use of those rent sums under paragraph 3(b) of the mortgage and deferred until an application for a drawdown of those fees the question of whether this use was of benefit to Fannie Mae and properly charged against the cash collateral as an administrative expense (doc # 106, p. 3-4, 6). Since that determination has not yet been made and a figure is needed to compute Fannie Mae's secured debt, for purposes of determining if the Debtor has established the confirmation standards and for purposes of ruling on Fannie Mae's motion for relief from stay or dismissal, the Court will count the $10,000 being held by counsel as part of Fannie Mae's cash collateral.

      With respect to the question of whether the funds in the replacement reserve account should have been released to the Debtor, or were properly retained as part of Fannie Mae's collateral, the Court relies upon the language of the loan documents. The germane facts are not in dispute. The Debtor, through its principal, Robert Falker, submitted a request to the servicer for reimbursement of $8,261.63 from the replacement reserve account on October 7, 2010 (Trial Ex. 44, as supplemented by this decision), one day before the Debtor filed the instant bankruptcy case. Fannie Mae has refused to release the funds. The language of the replacement reserve agreement describes the Debtor's right to reimbursement from that account, in pertinent part, as follows:

> Upon written request from Borrower and satisfaction of the requirements set forth in Sections 4 and 5 of this Agreement, Lender shall disburse to Borrower amounts from the Replacement Reserve necessary to reimburse Borrower for the actual approved costs of the

Replacements . . .. In no event shall Lender be obligated to disburse funds from the Replacement Reserve if a default or Event of Default exists, under this Agreement or any of the other Loan Documents.

(Trial Ex. 13, ¶ 4(a)). Despite Fannie Mae's post-hearing arguments to the contrary, there is nothing in the record to support its position that the request was insufficient or substantively improper. Therefore, if the Debtor were not in default, it would have been entitled to reimbursement. Fannie Mae presents three possible bases for finding a default: the Debtor's (a) failure to make timely payment in October 2010, (b) filing of the bankruptcy case, and (c) misuse of rental income. The Court has already found that the Debtor was not in payment default pre-petition because the grace period for the October payment had not yet expired (see doc. # 106). As to the second basis, Fannie Mae has not directed the Court's attention to any specific provision in the loan documents to support its assertion that the filing of the bankruptcy petition is an event of default. Fannie Mae presents the third basis for a finding of default for the first time in its post-hearing brief: namely, that the Debtor was in default under the loan documents at the time of the request because the Debtor used rental income in a manner that exceeded the scope of its license. Fannie Mae argues that this relieves it of the obligation to disburse funds from the Replacement Reserve. The Court previously held that the Debtor's funding of a retainer for its attorney from Fannie Mae's cash collateral was a breach of its obligations under paragraph 3(b) of the mortgage (doc. # 106, p. 4). This is a pre-petition default. Accordingly, pursuant to the plain language of the loan documents, the Debtor was not entitled to reimbursement from the Replacement Reserve Account and Fannie Mae was within its rights to deny the Debtor's October 7, 2010 request for reimbursement. The funds in this account therefore remain part of Fannie Mae's collateral (see Trial Ex. 13; see also doc. # 106).

For these reasons, the Court finds Fannie Mae's computation of the value of its collateral to be correct and to total $634,950.26, allocated among the following assets:

| | |
|---|---|
| State Street real property | $575,000.00 |
| Net adequate protections payments | $ 41,680.64 |
| Funds on retainer | $ 10,000.00 |
| Replacement reserve account | $ 8,269.62 |

## CONCLUSION

Based upon the foregoing, the Court (a) denies the valuation of collateral and amount of interest rate the Debtor seeks in its motion to determine value and sets the collateral value at $634,950.26 and the interest rate at 5.75%; (b) overrules the Debtor's objection to Fannie Mae's claim; (c) grants Fannie Mae's motion to supplement the record; (d) sustains Fannie Mae's objection to the Debtor's amended Schedule F; and (e) denies Fannie Mae's motion to strike the Sur-Reply except with respect to the allegations regarding settlement discussions.

This constitutes the Court's findings of fact and conclusions of law. The Court will address Fannie Mae's motion for relief from stay or dismissal (doc. ## 119, 120) in a separate decision.

    SO ORDERED.

November 4, 2011                                             Colleen A. Brown
Burlington, Vermont                                 United States Bankruptcy Judge